UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JOHN D. SELF )
 )
V. ) NO. 2:09-CV-199
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

## REPORT AND RECOMMENDATION

Plaintiff has filed this judicial appeal from the final decision of the defendant Commissioner to deny his applications for disability insurance benefits and supplemental security income under the Social Security Act. Plaintiff has filed a Motion [Doc. 12] for a judgment on the pleadings or, alternatively, for a remand to receive and consider additional evidence. The defendant has filed a Motion for Summary Judgment [Doc. 15].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff was 57 years of age, a person of "advanced age" under the Social Security regulations. His past relevant work was as a housekeeper, which is classified as light and unskilled; as a building maintenance worker, which is classified as medium and skilled; and as a construction worker which is heavy and semi-skilled. (Tr. 40). According to Ms. Katherine Bradford, the vocation expert utilized by the Administrative Law Judge ["ALJ"] at the administrative hearing, plaintiff has no transferable skills. (Tr. 40). He completed the 9th grade, but later obtained a GED. (Tr. 24).

The ALJ found that the plaintiff "has a severe emotional impairment" and "a combination of impairments which are marginally severe in a physical sense," which are gastrointestinal reflux disease, hypertension, hyperlipidemia and "possible back strain." [Tr. 15].

The plaintiff's medical history, both physical and mental, is summarized by the defendant Commissioner as follows:

> According to a medical record from 1996, Plaintiff was treated for basal cell carcinoma of the anterior chest wall (Tr. 155). In 1998, he had a spot on the left side of the nose which looked very classic for basal cell carcinoma, and he underwent a curettage (Tr. 157). He had six to eight erythematous crusted areas on the forehead, which were frozen (Tr. 157).
>
> On August 21, 2002, Plaintiff was a new patient at East Tennessee Health Consultants (Tr. 159). He was being seen for his history of hypertension (Tr. 159).
>
> On March 10, 2004, Plaintiff was seen at East Tennessee Health Consultants for his annual follow-up (Tr. 158). A possible melanoma was reported, and he was scheduled for removal of the melanoma (Tr. 158).
>
> Medical records from the Parrottsville Clinic, beginning in March 2004, are in the record (Tr. 179). On March 3, 2004, Plaintiff had a lesion on his right upper shoulder, and was referred for lesion removal (Tr. 179). Plaintiff also had diagnoses

of hyperlipidemia, hypertension, erectile dysfunction (ED), and eye pain (Tr. 178). Plaintiff was treated with medication for his conditions (Tr. 179).

On March 5, 2004, Jose Wee-Eng, M.D., saw Plaintiff for four lesions that needed to be removed (Tr. 163). On March 18, 2004, Dr. Wee-Eng performed an excisional biopsy, and the pathology report revealed basal cell carcinoma of two lesions (left upper arm and right back)(Tr. 163, 189). The other biopsies revealed seborrheic keratosis (right eye) and epidermoid cyst (back) (Tr. 189).

On March 15, 2004, Plaintiff was seen at Morristown Regional Eye Center for possible glaucoma (Tr. 162). On examination, there was no evidence of glaucoma, but he had very early cataracts (Tr. 162).

On May 26, 2004, Plaintiff was seen for a follow-up for his conditions at the Parrottsville Clinic (Tr. 178). On August 23, 2004, he was diagnosed with a keratotic lesion; he continued to be treated for hypertension and hyperlipidemia (Tr. 177). On December 3, 2004, and February 23, 2005, Plaintiff was seen at the Parrottsville Clinic for follow-ups for his hypertension and hyperlipidemia (Tr. 175-76).

On May 25, 2005, a note from the Parrottsville Clinic indicated a lesion on Plaintiff's right thigh for about a year, which was growing (Tr. 174). Plaintiff also had a lesion on his left inner thigh, which was asymptomatic, and multiple spots on his forearms, which got red in the sun (Tr. 174). Plaintiff was diagnosed with keratosis, a skin tag on the left thigh, and a suspicious lesion on the right thigh (Tr. 174). He was referred to dermatology for a biopsy report on the lesion from the right thigh (Tr. 174). On May 31, 2005, a surgical pathology report indicated that the biopsy of the skin lesion on the right thigh was suggestive of seborrheic keratosis with chronic rubbing changes, and the lesion extended to deep biopsy margins; if the lesion recurred or worsened, conservative excision to insure complete removal was recommended (Tr. 184).

On November 22, 2005, a treatment note from the Parrottsville Clinic indicated that Plaintiff's hypertension was "improved" (Tr. 172). On March 3, 2006, a note from the Parrottsville Clinic indicated that Plaintiff's depression was controlled with Zoloft (Tr. 171).

On June 1, 2006, Plaintiff was seen at the Parrottsville Clinic for a three month followup (Tr. 170). He complained of dizziness when standing too quickly, but it resolved quickly (Tr. 170). According to the treatment note, Plaintiff's blood pressure and GERD were controlled (Tr. 170).

On July 21, 2006, Plaintiff was seen at the Parrottsville Clinic for a rapidly growing lesion on the right shoulder for one week (Tr. 169). The doctor discussed the need for an excision, and an excisional biopsy was performed (Tr. 169). On July

25, 2006, a surgical pathology indicated well differentiated squamous cell carcinoma, completely removed (Tr. 181).

On September 1, 2006, Plaintiff was seen at the Parrottsville Clinic after experiencing pain after lifting a refrigerator three days earlier (Tr. 167). According to the treatment note, Plaintiff's hypertension and GERD were controlled with medication (Tr. 167).

On January 22, 2007, Plaintiff saw Pamela Sanders, M.D., at the Parrottsville Clinic (Tr. 232). Plaintiff indicated that his blood pressure was usually well-controlled at home (Tr. 232). He complained of occasional panic attacks, which occurred if he was around many people (Tr. 232). Dr. Sanders noted that Plaintiff's hypertension was stable on medication (Tr. 232). She indicated he should continue Zoloft for agoraphobia with panic disorder, and she referred him to Cherokee Mental Health for a psychological evaluation (Tr. 232).

According to notes from Cherokee Health Systems, Plaintiff was seen on March 15, 2007 (Tr. 221). He was referred by his doctor for isolating himself from everyone, feeling nervous around people, disrupted sleep, decreased appetite, feeling sad all the time, crying, feeling hopeless, decreased energy, and feeling criticized all the time (Tr. 221). Plaintiff was diagnosed with adjustment disorder with mixed emotions, rule out mood disorder, and screen for panic and generalized anxiety disorder (Tr. 225). He had a Global Assessment of Functioning (GAF) score of 55 (Tr. 225). It was noted that he had been talking Zoloft (Tr. 225).

On March 15, 2007, Lloyd Walwyn, M.D., a state agency physician specializing in orthopedics, completed a medical consultant analysis and opined that Plaintiff did not have any severe impairments (Tr. 200-02). In arriving at his opinion, Dr. Walwyn considered treatment notes showed that Plaintiff's GERD had resolved by March 2006 and that his back pain had resolved by September 2006, and his hypertension was controlled with medication (Tr. 203). Dr. Walwyn also considered Plaintiff's activities of daily living (Tr. 203).

On March 23, 2007, Jeffrey Bryant, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique (Tr. 204-17). Dr. Bryant opined that Plaintiff did not have a severe mental impairment (Tr. 204). Dr. Bryant considered Plaintiff's depressive disorder, but indicated it was controlled with medication (Tr. 207). He opined that Plaintiff had mild limitation in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and no episodes of decompensation (Tr. 214). He also opined that Plaintiff did not meet any of the "C" criteria (Tr. 215). Dr. Bryant considered that
Plaintiff had not received any mental health treatment, nor hospitalizations (Tr. 216). Dr. Bryant considered that Plaintiff had been prescribed Zoloft, and a treatment note dated June 1, 2006, indicated his depression was controlled with Zoloft (Tr. 216). He

4

also considered Plaintiff's activities, which included caring for pets, personal care, walking a long way, watching television, preparing meals, housecleaning, driving, paying bills, handling finances, going out alone, and getting along well with authority figures (Tr. 216).

On March 27, 2007, in a report signed by Charlene Frazier, a psychiatric nurse practitioner, and Gregg Perry, M.D., a staff psychiatrist (at Cherokee Health Systems), it was indicated that Plaintiff had a normal appearance, cooperative attitude, normal speech and thought process and content, and appropriate affect (Tr. 220). His mood was depressed and anxious (Tr. 220). His diagnoses were major depressive disorder, adjustment disorder, rule out generalized anxiety disorder, and a GAF score of 55 (Tr. 220). Plaintiff's medication was changed to Celexa, and he was to follow up in four weeks (Tr. 220).

On April 12, 2007, Plaintiff reported his mood was much improved (Tr. 263). He stated that he had not been taking medications prescribed for the past three weeks, but "I feel much better" (Tr. 263).

On April 24, 2007, Ms. Frazier reported that Plaintiff was not depressed anymore and he was sleeping better (Tr. 218). On mental status examination, Plaintiff had a normal appearance, cooperative attitude, calm motor activity, normal speech, euthymic mood, appropriate affect, and normal thought process and thought content (Tr. 218).

On May 7, 2007, Plaintiff returned to the Parrottsville Clinic (Tr. 229). Plaintiff's physical examination was normal (Tr. 282). Dr. Sanders indicated that Plaintiff's hypertension was well-controlled; hyperlipidemia was stable, depressive disorder was stable; and he was given Viagra samples for impotence of organic origin (Tr. 230).

On September 6, 2007, Stephen Franklin, M.D., examined Plaintiff's eyes (Tr. 257-58). Plaintiff's best corrected vision was 20/25 in both eyes (Tr. 257). His visual fields were full in each eye (Tr. 257). Dr. Franklin indicated that Plaintiff had refractive error, and if he obtained glasses, he would have normal visual acuity and should be able to perform any occupation without visual limitation (Tr. 257).

On September 24, 2007, George Davis, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment (Tr. 235-51). Dr. Davis opined that, given Plaintiff's depression and generalized anxiety, he had mild limitations in activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation (Tr. 245). Dr. Davis considered the Cherokee Mental Health records from March to April 2007 as well as Plaintiff's activities (Tr. 247). In the Mental Residual Functional Capacity

5

Assessment, he opined that Plaintiff could understand and remember simple and detailed tasks; could concentrate and attend to the same tasks, despite some difficulty; could interact with coworkers and supervisors without significant limitations; and could relate with the general public despite some difficulty (Tr. 251).

On October 24, 2007, Dr. Sanders saw Plaintiff for his complaints of a lesion on his forehead for two to three weeks (Tr. 279). It had started small, but grew rapidly, and he felt it was like his prior skin cancers (Tr. 279). Dr. Sanders noted likely basal cell carcinoma; it was too large for her to excise, so she referred Plaintiff to dermatology (Tr. 280).

On October 30, 2007, Susan Warner, M.D., a state agency internist, opined that Plaintiff had no severe physical impairments (Tr. 253-56). Dr. Warner considered Plaintiff's allegations of hypertension, eye problems, skin cancer, back strain, and GERD (Tr. 256). She considered the evidence before her, including August 2007 ophthalmoloigcal notes indicating 20/25 corrected vision in both eyes, full visual fields; May 2007 treatment notes regarding hypertension and squamous cell and basal cell cancers, which were completely removed, physical evaluation findings; September 2006 progress notes; and March 2006 progress notes indicating that Plaintiff's GERD controlled (Tr. 256).

On November 27, 2007, Dr. Sanders saw Plaintiff, indicating his chief complaint was hypertension (Tr. 277). Plaintiff complained that he was "down in the dumps" and was depressed at Christmas time (Tr. 277). It was noted that Plaintiff had gone to the dermatologist regarding the lesion on his right temple, but they were going to charge him $5,000 to remove it, so he cut it off himself (Tr. 277). Plaintiff also requested samples of Viagra (Tr. 277). Plaintiff's physical examination was normal (Tr. 278). Dr. Sanders assessed controlled hypertension (Tr. 278). She recommended Plaintiff return to Cherokee to discuss his depression (Tr. 278). With regard to hypertension, GERD and impotence, she recommended that Plaintiff should continue his current medications (Tr. 278).

On August 14, 2008, Plaintiff saw Dr. Sanders (Tr. 275). According to her treatment note, Plaintiff chief complaint was listed as impotence of organic origin, for which he was requesting Viagra (Tr. 275). According to a computer screen printout, Plaintiff's chief complaint was he needed Chantix (Tr. 292). In addition, Plaintiff complained of dizziness when standing; he stated that "nothing is working out right," and he felt like he could not anything; and he had trouble with his memory (Tr. 275). He also stated that, with regard to his tobacco abuse, he wanted to quit, and would like to take Chantix again (Tr. 275). On examination, his blood pressure was 130/70, and his physical examination was normal (Tr. 276). Dr. Sanders increased Plaintiff's dosage of Zoloft; she indicated his hypertension was controlled, and with regard to hypertension, hyperlipidemia, and GERD, he should continue his current medications (Tr. 276).

[Doc. 16, pgs. 5-11].

There are two items of testimony by the plaintiff at his administrative hearing on September 3, 2008, to be noted. First, the plaintiff testified that he completed the 9th Grade, but later obtained a GED.[1] (Tr. 24). The second involves a heated and unfortunate exchange which took place between the plaintiff and the ALJ later on in the hearing. Plaintiff has had numerous surgeries to remove skin lesions, some of them cancerous. Plaintiff remarked that he had a large lesion on his nose at the time of his hearing which "I can't get nobody to do anything with." (Tr. 26). Apparently, the ALJ noted it later when he asked the plaintiff "[b]ut you can't get any help for this one that's on your face?" Plaintiff replied "no" to the question. (Tr. 27). Plaintiff then continued to be questioned by his attorney on various topics for what must have been a few minutes.

Then, the ALJ abruptly interrupted the plaintiff in mid-sentence and the following exchange took place:

> EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE
>
> Q.    Mr. Self, you said you haven't had anybody be able to do [*sic*] anything about your last skin lesions. When's the last time you went to the doctor?
>
> A.    It was, well my appointment is September 18th. And it was a month before that. So it would be August, just August 18th.
>
> Q.    Why did you go to the doctor on August 14th?
>
> A.    It was just to -
>
> Q.    August 16, well, it was August 14th when you went. Why'd you go there?

---

[1] Plaintiff also stated this in his "Disability Report", SSA-3368 filed with the Administration prior to the hearing for evaluation of his claim by the state agency. (Tr. 112).

A. I went to just a regular checkup.

Q. No, what was your problem? What was your main concern? Matter of fact, you're only complaint at that time was what?

A. She just called me and told me to come in a get blood tests.

Q. According to the doctor, your only complaint the last time you went to the doctor was impotence and you wanted Viagra. Is that correct?

A. No sir.

Q. Yeah, well, I'm sorry. That's what the doctor's record says.

A. I'm sorry, sir. No. sir, that's –

Q. You want to see the doctor's, what she said? Go ahead, counselor. That's your only complaint. That's your only problem. Go ahead. Don't tell me no when if the doctor says it is right in here.

A. Sir, that's, that's false.

Q. Well, I don't believe it. The doctor has no reason to lie.

A. I don't know why she said that. I , she asked me when I went in did I need it? And I said sure.

Q. Most doctors don't over and ask you would you need Viagra. [*sic*].

A. Well, she did. She did. She asked me was I still having that problem.

Q. They hardly, they hardly go in and say, sir, do you need Viagra? Go–

A. No. She asked me was I still having my, she asked me every question that she's asked me about my back and about my, she said all these–

Q. According to her, your only complaint was that. And you had no other problems.

(Tr. 29-31).

As stated in the *Commissioner's* recitation of the medical evidence, at pages 6 and 7 of this report and recommendation above, plaintiff had a variety of complaints on the August

14th visit. As for what plaintiff's actual "chief complaint" on that date was, Dr. Sanders, who wrote the note, listed "impotence of organic origin" on Tr. 275, and "needs Chantix" at Tr. 292.[2] Notably, the record on Tr. 292 indicates that the plaintiff was there for a scheduled appointment, since a box is checked which says "Appointment Kept." This corroborates the plaintiff's testimony that it was a regularly scheduled appointment rather than a mere attempt to get Viagra.

The ALJ did not refer to the August 14th visit in his hearing decision. However, he did find that the plaintiff's testimony was not credible. The primary basis stated in the hearing decision was because "claimant's testimony" that he had "a ninth grade education" was "not consistent with the record." (Tr. 17). The ALJ pointed out that the plaintiff had told officials at Cherokee Mental Health that he had a GED, and that he had also done so in the aforementioned Disability Report. What the ALJ missed completely was that the plaintiff told *the ALJ* in his testimony that he completed the 9th Grade and then obtained his GED.

In point of fact, the ALJ's diatribe over the August 14, 3008, visit by plaintiff to Dr. Sanders made it clear that during the remainder of the administrative hearing, that he would not have believed plaintiff if he had said the sun rises in the morning and does so in the East. No finder of fact will, or should, tolerate being lied to. However, this "gotcha" moment was unsupported and based upon a visibly inaccurate assumption. In any event, neither the fact that the ALJ mistakenly thought he had been lied to by the plaintiff about his education, or

---

[2] Tr. 292 was not in the record at the time of the administrative hearing, but was later added by counsel after the ALJ's exchange with plaintiff. However, Tr. 275 and 276 reveal a number of conditions and complaints and treatments. Dr. Sanders doubled the plaintiff's Zoloft prescription.

the unhappy and unnecessary confusion over Dr. Sander's report were grounds for finding the plaintiff to not be credible.

The ALJ, in his hearing decision, found that the plaintiff had "the residual functional capacity to perform at least medium work...except that such work should be simple, routine and repetitive and involve only occasional contact with the public. The work should also not involve dangerous equipment or machinery, unprotected heights, or temperature extremes." (Tr. 16). The ALJ found that the plaintiff could return to his past relevant work as a housekeeper. Accordingly, the ALJ found that he was not disabled. (Tr. 19).

Plaintiff asserts that there are three issues for determination in this action. First, he challenges whether there is substantial evidence to support the ALJ's finding of residual functional capacity. Second, he asserts that the ALJ made up his mind regarding the plaintiff's credibility and ultimately whether he was disabled based upon the ALJ's misreading of Dr. Sander's notes and misunderstanding of the plaintiff's testimony regarding the extent of his education. Finally, plaintiff alternatively asks that the case be remanded for reconsideration following consultative medical and psychological evaluations to be obtained by the Commissioner.

It is to be noted at the outset that plaintiff comes very close to being "disabled" under the Medical Vocational Guidelines (the "Grids") found in 20 CFR Ch. III, Pt.404, Supt. P, App. 2. Under Rule 202.6, a person of advanced age who can perform the full range of light work[3] with a high school diploma or more ,whose education does not provide for direct entry

---

[3]The ALJ found the plaintiff can perform a reduced range of medium work. In the medium category, a person who has even a limited education and has performed any type of work in the past, skilled or unskilled, is "not disabled."

into skilled work, and whose past relevant work was skilled or semiskilled with the skills not transferable is "disabled." Of course, in this case, the ALJ found that the plaintiff could return to one of his past relevant jobs, thus eliminating the need to show that other jobs exist which he could perform, and the need to rely either on the Grids or upon the vocational expert. But it does show, with the impairments found by the ALJ, that this is a very close case on the merits.

The ALJ found that the plaintiff had a "severe emotional impairment." Indeed, the plaintiff's treating family doctor has prescribed Zoloft for quite some time, and increased the dosage at the aforementioned August 14, 2008 visit. There are two evaluations by state agency psychologists (Tr. 204-217 and 235-252). The first found no mental impairments, while the second found that "claimant's depression and anxiety were severe, at least in combination, and that they led to moderate limitations in social functioning and in concentration, persistence or pace." (Tr. 18) Because of later treatment at Cherokee Mental Health which apparently had a positive effect, the ALJ to some degree appears to disagree with the second state agency assessment. However, he still limited the plaintiff to simple, routine, repetitive work requiring only occasional contact with the general public.

What is troublesome in this regard is that without any further assessment by any mental health professional, even by a non-examining state agency source, the ALJ found on his own that the restrictions he himself placed on the plaintiff were all that was necessary to allow plaintiff to perform his past relevant work as a housekeeper.[4]

---

[4] The Court notes that this past relevant job was performed by the plaintiff in 2000 and 2001, long before any emotional problems were diagnosed or treated.

In the opinion of the Court, a consultative mental examination should be performed by a mental health professional with access to the records of plaintiff's treatment at Parrotsville Clinic and Cherokee Mental Health. It is also highly recommended that a vocational expert be consulted to opine whether a person with such mental limitations as the ALJ may then find can perform the plaintiff's past relevant work, or other jobs which exist in substantial numbers in the national economy.

The Court is also troubled about the skin lesion that was visible to all present at the administrative hearing. The plaintiff has suffered from multiple recurrent skin cancers requiring excision, including a basal cell and squamous cell carcinomas. In fact, given the combination of impairments found by the ALJ, which included a "possible strained back," (Tr. 15) a consultative medical examination to determine the plaintiff's physical capabilities is also in order. This is particularly true when an ability to perform only light work would render him disabled under the Grids.

With respect to the issue of whether a different ALJ should handle the plaintiff's case upon remand, this Court is extremely reluctant to recommend "ordering" the Commissioner to take such a step. However in this case, it certainly appears that plaintiff and the ALJ below have reached such a state of acrimony as would call into question any future adverse decision regarding plaintiff by that ALJ. It would appear to be in everyone's best interest to assign this case to a new ALJ.

It is therefore respectfully recommended that this case be remanded to the defendant

Commissioner for both mental and physical examinations and assessments.[5] It is further recommended that the plaintiff's Motion [Doc. 12] be GRANTED to the extent it requests a remand. It is further recommended that the defendant Commissioner's Motion for Summary Judgment [Doc. 15] be DENIED.[6]

Respectfully Submitted:

s/ Dennis H. Inman
United States Magistrate Judge

---

[5] Plaintiff also asks that this Court "retain jurisdiction for purposes of reviewing any supplemental findings..." Other than the possible issue of CJRA attorney fees, this case, like other Social Security appeals, should not be retained as an "open" case on the Court's docket.

[6] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).